**Virginia F. MILLER, Plaintiff/Appellant,**

v.

**AMERICAN EXPRESS COMPANY, Defendant/Appellee.**

No. 81–5257.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1982.

Decided Sept. 27, 1982.

Kraig J. Marton, Marton, Halladay & Hall, Phoenix, Ariz., for plaintiff/appellant.

John G. Sestak, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendant/appellee.

Before POOLE and BOOCHEVER, Circuit Judges and PFAELZER *, District Judge.

BOOCHEVER, Circuit Judge:

Virginia Miller brought an action in district court alleging a violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691 *et seq.*, after her American Express card was cancelled following the death of her husband. At issue is whether the American Express Company's (Amex) policy of automatically cancelling a supplementary cardholder's account upon the death of the basic cardholder violated the ECOA. The district court granted Amex's motion for summary judgment. We reverse.

---

* Honorable Mariana R. Pfaelzer, United States District Judge for the Central District of California, sitting by designation.

## FACTS

Maurice Miller, plaintiff's late husband, applied for and received an American Express credit card in 1966. His account was denominated a Basic Card Account. Later in 1966, plaintiff Virginia Miller applied for and was granted a supplementary card. Her application was signed by her husband as the basic cardholder and by her. Mrs. Miller agreed to be personally liable for all charges made on her supplementary card. Her card bore a different account number from her husband's card, was issued in her own name, required a separate annual fee, and bore a different expiration date from Mr. Miller's card. The Millers used their American Express cards until Mr. Miller passed away in May, 1979. Two months after her husband's death, Mrs. Miller attempted to use her card during a shopping trip and was informed by the store clerk that her account had been cancelled. This was the first notice she received of the cancellation. Subsequently, Amex informed her that her account had been cancelled pursuant to a policy of automatically terminating the account of a supplementary cardholder upon the death of a basic cardholder. Amex invited her to apply for a basic account. Her application for a new account consisted merely of filling out a short form, entitled "Request to Change Membership status from Supplementary to Basic Card member," which did not require any financial or credit history data. Amex issued Mrs. Miller a new card, apparently on the basis of her thirteen year credit history in the use of the card it had just cancelled. Mrs. Miller brought suit against Amex for violation of the ECOA.

In the district court, the parties made cross motions for summary judgment on the issue of liability. Mrs. Miller argued that because her supplementary card had been cancelled after a change in her marital status, 12 C.F.R. § 202.7(c) had been violated, giving rise to a cause of action under the ECOA. Amex argued that Mrs. Miller was not within the terms of the regulation, and that she had not raised an issue of fact as to whether its allegedly uniform cancellation policy was discriminatory in motive or effect. The court awarded summary judgment to Amex without specifying its reasons.

## ANALYSIS

The issues on this appeal are whether Amex's policy of cancelling a spouse's supplementary account upon the death of the basic cardholder violates the ECOA and whether a plaintiff must always show discriminatory intent or effect to establish an ECOA violation. The facts are undisputed, therefore, we must decide whether the substantive law was correctly applied. *Yazzie v. Olney, Levy, Kaplan & Tenner*, 593 F.2d 100, 102 (9th Cir. 1979). We hold that there has been credit discrimination within the meaning of the ECOA and that partial summary judgment on the issue of liability should have been granted to Mrs. Miller, rather than to Amex.

The ECOA makes it unlawful for any creditor to discriminate with respect to any credit transaction on the basis of marital status. 15 U.S.C. § 1691(a)(1). It also authorizes the Board of Governors of the Federal Reserve System (Board) to prescribe regulations, 15 U.S.C. § 1691b, and creates a private right of action for declaratory and equitable relief and for actual and punitive damages. 15 U.S.C. § 1691e.

In order to carry out the purposes of the ECOA, the Board promulgated the regulations codified at 12 C.F.R. §§ 201.1 *et seq.* Section 202.7(c)(1) provides that a creditor shall not terminate the account of a person who is contractually liable on an existing open end account on the basis of a change in marital status in the absence of evidence of inability or unwillingness to repay. Under certain circumstances, a creditor may require a reapplication after a change in the applicant's marital status. 12 C.F.R. § 202.7(c)(2).

Mrs. Miller's Amex card was cancelled after her marital status changed from married to widowed. Under § 202.7(c)(2), Amex could have asked her to reapply for credit, but instead it first terminated her card and then invited reapplication. There was no contention or evidence that her wid-

owhood rendered Mrs. Miller unable or unwilling to pay, indeed, Amex's prompt issuance of a new card to her indicates that she was considered creditworthy.

Amex has argued that there was no violation of the ECOA for three reasons: that Section 202.7(c) was beyond the scope of the Board's authority, that Mrs. Miller was not "contractually liable on an existing open end account" within the meaning of § 202.-7(c), and that the termination did not constitute discrimination on the basis of marital status because it occurred pursuant to a policy of automatic cancellation of all supplementary cardholders whether they were widow, widower, sibling, or child of the basic cardholder. We hold that § 202.7(c) was within the scope of the Board's authority under the ECOA, and that Mrs. Miller was within the protection of the regulation.

## I

### Authority for Section 202.7(c)

■ We reject Amex's contention that the Board exceeded its authority in promulgating § 202.7(c), the regulation forbidding credit terminations "on the basis of" marital status. The Board is required to "prescribe regulations to carry out the purposes of [the ECOA]." 15 U.S.C. § 1691b. Although the ECOA outlaws credit "discrimination," the meaning of that term must be defined with reference to the purposes of the Act. The history of the ECOA shows that it was meant to reach credit decisions based on factors such as sex, marital status, and race which are irrelevant to creditworthiness. S. Rep. No. 94–589, 94th Cong., 2d Sess. 3, *reprinted in* 1976 U.S. Code Cong. & Ad. News 403, 405–06. The Senate Report accompanying the 1976 amendments to the ECOA characterizes decisions made on the basis of such characteristics as "irrational discrimination." *Id.*

In passing the ECOA, Congress contemplated that the Board would have significant flexibility in its enforcement authority.

Conference Report No. 93–1429, 93d Cong., 2d Sess. *reprinted in* 1974 U.S. Code Cong. & Ad. News 6119, 6148, 6152–53. A definition of discrimination was deleted from the final bill in order to leave broad flexibility in the Board to specify what conduct would be prohibited. *Id.,* S. 3492, 93d Cong., 2d Sess. § 702(8) (1974). Section 2.207(c) is directly addressed to one of the evils that the ECOA was designed to prevent: loss of credit because of widowhood. *See generally* 121 Cong. Rec. H27,135 (daily ed. Aug. 1, 1975) (statement of Rep. Sullivan). It was therefore within the discretion allowed the Board to define termination or credit as a result of the death of a spouse as credit discrimination.[1]

## II

### Application of Section 202.7(c)

A. Coverage of the Regulation: Contractual Liability on an Open End Account

■ By its terms, § 202.7(c) reaches only terminations of existing open end accounts on which the creditholder is contractually liable. "Open End Credit" is defined in 12 C.F.R. § 202.2(w) as "credit extended pursuant to a plan under which a creditor may permit an applicant to make purchases or obtain loan[s] from time to time. . . ." "Contractually liable" means "expressly obligated to repay all debts arising on an account by reason of an agreement to that effect." 12 C.F.R. § 202.2(i). Amex has argued that the reference to persons "contractually liable" was meant to exclude spouses who are only "users" of accounts. The Federal Reserve Board's comments, made when the "contractually liable" phrase was added in 1975, indicate that the phrase was designed to exclude a "user" who might be liable for a specific debt charged to a spouse's account, *"but [who] is not liable on the contract creating the account."* 40 Fed.Reg. 49,298 (1975) (emphasis added).

*FRB Policy Statement and Guidelines,* 50 U.S. L.W. 2233 (Oct. 7, 1981).

---

1. In a recent policy statement, the Federal Reserve Board characterized a violation of § 202.7 as a serious violation of the ECOA.

Mrs. Miller was not, however, merely a user of her husband's basic account. She was personally liable under the contract creating her supplementary account for all debts charged on her card by any person. For example, Mrs. Miller would have been personally liable for even charges made on her supplementary card by her husband, the basic cardholder.

We are unconvinced by Amex's argument that the supplementary account was created by the agreement establishing Mr. Miller's basic card account. Mrs. Miller's supplementary card was issued after the basic card account had been set up, and pursuant to a separate application which had to be signed by Mrs. Miller as well as by her husband. If the basic card account had already created the supplementary account, such prerequisites to a supplementary card, especially Mrs. Miller's agreement to be liable, would be unnecessary.

Amex's cardholder agreement provides that "by either signing, using or accepting the Card, you will be agreeing with us to everything written here" and that "[i]f you are a Supplementary Cardmember, you are liable to us for all Charges made in connection with the Card issued to you. . . ." This language made Mrs. Miller "contractually liable" for all debts on her supplementary account.[2]

Other differences between Mrs. Miller's card and her husband's also persuade us that her supplementary account was in substance a separate account from her husband's basic one. Her card was issued in her own name, carried an additional issuance fee, and had a different account number and expiration date from Mr. Miller's card.

B. Termination on the Basis of Marital Status: Proof of Credit Discrimination

The ECOA outlaws credit discrimination on the basis of marital status. The regulations proscribe particular adverse actions, including account terminations, which violate the Act if performed on the basis of marital status. Amex argues that it was entitled to summary judgment because Mrs. Miller did not attempt to show that Amex's policy of cancelling all supplementary cardholders on the death of the basic cardholder either was adopted with discriminatory intent or had an adverse impact on widows as a class. In light of the purposes of the ECOA, we do not think such a restrictive interpretation of the regulation is warranted.

The ECOA was meant to protect women, among others, from arbitrary denial or termination of credit. *See Anderson v. United Finance Co.,* 666 F.2d 1274, 1277 (9th Cir. 1982). It establishes "as clear national policy that no credit applicant shall be denied . . . on the basis of characteristics that have nothing to do with his or her creditworthiness." Equal Credit Opportunity Act Amendments of 1976, S. Rep. No. 94–589, 94th Cong., 2d Sess. 3, *reprinted in* 1976 U.S. Code Cong. & Ad. News 403, 405.

In *Anderson,* we held that there was credit "discrimination" within the meaning of the ECOA when a regulation promulgated under the ECOA was violated. No showing of any specific intent to discriminate was required. 666 F.2d at 1277. As another court has noted, not requiring proof of discriminatory intent is especially appropriate in analysis of ECOA violations because "discrimination in credit transactions is more likely to be of the unintentional, rather than the intentional, variety." *Cherry v. Amoco Oil Co.,* 490 F.Supp. 1026, 1030 (N.D. Ga. 1980).

If specific intent is not proved, we nevertheless do not think that a statistical showing of an adverse impact on women is always necessary to the plaintiff's case. The ECOA's history refers by analogy to the disparate treatment and adverse impact

---

**2.** The Supreme Court's recent decision in *American Express Company v. Koerner,* 452 U.S. 233, 101 S.Ct. 2281, 68 L.Ed.2d 803 (1981) is inapposite. In *Koerner,* the plaintiff held a card under a company account. Inapplicability of the Fair Credit Billing Act was not based on the basic/supplementary card distinction, but rather upon the fact that his card was issued primarily for business use. *Id.* at 245, 101 S.Ct. at 2288.

tests for discrimination which are used in employment discrimination cases under Title VII. Although none has expressly so held, some district courts have treated the references in the history and regulations to Title VII as if the ECOA plaintiff's prima facie case must always contain elements similar to those required under either the adverse impact or the disparate treatment tests used under Title VII. *Sayers v. General Motors Acceptance Corp.*, 522 F.Supp. 835, 839–40 (W.D. Mo. 1981); *Cragin v. First Federal Savings and Loan Ass'n.*, 498 F.Supp. 379, 384 (D. Nev. 1980); *Cherry*, 490 F.Supp. at 1026; *Vander Missen v. Kellogg-Citizens National Bank*, 481 F.Supp. 742 (E.D. Wis. 1979). These courts, like Amex here, relied on an incomplete reading of a passage from the Senate Report to the 1976 ECOA amendments. The Senate Report states that:

> In determining the existence of discrimination . . . courts or agencies are *free to look at* the effects of a creditor's practices as well as the creditor's motives or *conduct* in individual transactions. (emphasis added)

S. Rep. No. 94–589, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S. Code Cong. & Ad. News 403, 406. The report then cites two adverse impact employment discrimination cases "to serve as guidelines in the application of this Act." Both cases are relevant to the "effects" test, analogous to adverse impact analysis in Title VII. Read in full, the Senate Report allows but does not limit proof of credit discrimination to the two traditional Title VII tests for employment discrimination. It also expressly recognizes that a creditor's conduct in an individual transaction may be considered to determine the existence of credit discrimination, quite apart from intent or from a statistical showing of adverse impact.

██ The conduct here was squarely within that prohibited by § 202.7(c). Mrs. Miller's account was terminated in response to her husband's death and without reference to or even inquiry regarding her creditworthiness. It is undisputed that the death of her husband was the sole reason for Amex's termination of Mrs. Miller's credit. Amex contends that its automatic cancellation policy was necessary to protect it from noncreditworthy supplementary cardholders. The regulations, however, prohibit termination based on a spouse's death in the absence of evidence of inability or unwillingness to repay. Amex has never contended in this action that the death of her husband rendered Mrs. Miller unable or unwilling to pay charges made on her card. The fact that the cancellation policy could also result in the termination of a supplemental cardholder who was not protected by the ECOA, such as a sibling or friend of the basic cardholder, does not change the essential fact that Mrs. Miller's account was terminated solely because of her husband's death. The interruption of Mrs. Miller's credit on the basis of the change in her marital status is precisely the type of occurrence that the ECOA and regulations thereunder are designed to prevent.

We hold that the undisputed facts show, as a matter of law, that Amex violated the ECOA and regulations thereunder in its termination of Mrs. Miller's supplementary card. For this reason, we reverse the district court's grant of summary judgment for Amex and instruct that partial summary judgment should be awarded to Mrs. Miller on the issue of liability. The case is remanded for further proceedings consistent with this opinion.

POOLE, Circuit Judge, dissenting.

The majority today holds in effect that a credit practice need not be discriminatory to violate the Equal Credit Opportunity Act (the Act). Because this holding is contrary to the clear language and purpose of the Act, I respectfully dissent.

*Applicability of § 202.7(c)*

Although a close question, I agree with the majority that American Express supplementary cardholders are "contractually liable on an existing open end account" and are thus protected by 12 C.F.R. § 202.7(c). In support of its argument that supplementary cardholders are merely "authorized users" of an account, American Express

points out that its agreement with card-members specifically states that only one account—the Basic Card Account—is established and supplementary cardholders are granted the right to use that account. However, what controls is not American Express's characterization of its credit system, but the rights granted to and liabilities imposed upon the supplementary cardholder. The majority correctly finds that the liabilities imposed upon supplementary cardholders are inconsistent with mere "authorized user" status.

### Violation of § 202.7(c)

It is a fact that American Express cancelled appellant's supplementary card after the death of her husband. Section 202.7(c), however, does not prohibit the termination of an account after a change in an applicant's marital status; it prohibits only the termination of an account "on the basis of" such a change. Since the change in appellant's marital status was not the basis for American Express's decision to cancel her supplementary card, there has been no violation of § 202.7(c).

Under the terms of the agreement by which it issues both basic and supplementary cards, American Express reserves the right to cancel a supplementary card if the basic cardholder is unable or unwilling to meet all the obligations relating either to the supplementary card or to the basic card account. It was undisputed that American Express uniformly cancels both the basic card account and all supplementary cards issued thereon upon the death of the basic cardholder, since the basic cardholder's death renders him or her unable to meet these obligations. This is a neutral policy, evenhandedly applied whatever the relationship between the basic and supplementary cardholders, i.e., whether they are brother and sister, mother and son, father and daughter, or husband and wife. The fact that in a particular case the death of the basic cardholder also changes the marital status of the supplementary cardholder is thus entirely incidental and immaterial to the basis for the cancellation of the supplementary card. *See Haynsworth v. South Carolina Electric and Gas Co.*, 488 F.Supp. 565, 567 (D.S. Car. 1979). *See also* FRB letter of January 12, 1976, CCH Consumer Credit Guide ¶ 42,080.

The holding that the cancellation of appellant's card under such circumstances was "on the basis of" the change in her marital status is a construction of § 202.7(c) that is clearly contrary to the language and the purpose of the Act.[1] The Act prohibits only those credit practices that discriminate against an applicant on any of a number of enumerated bases, such as sex or marital status. 15 U.S.C. § 1691(a). In other words, a creditor may not treat an applicant differently with respect to credit decisions, all other facts being the same, because of his or her sex or marital status. *See Markham v. Colonial Mortgage Service Co. Associates*, 605 F.2d 566, 569 (D.C. Cir. 1979). The purpose of the Act is "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982). The regulations promulgated by the Board of Governors of the Federal Reserve System, including § 202.7(c), must be consistent with the purposes of the Act. 15 U.S.C. § 1691b(a). Thus, while the Board is given discretion in determining whether a particular type of discriminatory credit practice is the type the Act was meant to prohibit, *see Anderson v. United Finance, supra*, 666 F.2d at 1277, the regulations may nevertheless prohibit only those practices that are in fact discriminatory.[2]

American Express's practice is not discriminatory since cancellation of supple-

---

**1.** The issue is not, as the majority states, whether the Board of Governors of the Federal Reserve System had the authority to promulgate § 202.7(c). Authority clearly exists to define as a discriminatory credit practice the termination of an applicant's account on the basis of the death of his or her spouse. The issue is whether the majority's interpretation of § 202.7(c), particularly the phrase "on the basis of," is consistent with the purpose of the statute and the regulation.

**2.** This court in *Anderson* held that, by violating 12 C.F.R. § 202.7(d)(1), a creditor had discriminated within the meaning of the Act. 666 F.2d

mentary cards is an evenhanded and uniform consequence suffered by all supplementary cardholders and is not at all operative because of a change in a cardholder's marital status. The majority's holding thus does not contribute to the eradication of credit discrimination. Rather, it prevents American Express from treating all supplementary cardholders alike and instead forces it to give preferential treatment to those supplementary cardholders who happen to have been married to the basic cardholder. Such a result stands the Act on its head.

Since appellant's supplementary card was not cancelled on the basis of the change in her marital status, there was no violation of § 202.7(c) or the Act.[3] I would therefore affirm the district court's grant of summary judgment in favor of American Express.

at 1277. The creditor had admitted that its practice was discriminatory and thus in violation of the regulation. It argued, however, that this "technical" violation did not result in a violation of the Act. *Id.* at 1276.

By contrast, American Express argues that its practice is not discriminatory and thus does not violate § 202.7(c). *Anderson* is therefore inapplicable to this case, since it in no way can be read to stand for the proposition that a credit practice need not be discriminatory to violate either the regulations or the Act.

**3.** This is not to say that American Express's practice is immune from attack under the Act or under § 202.7(c). Appellant could have challenged the practice on the ground that, though neutral on its face and as applied, it has a disproportionate impact on women whose marital status changes as a result of the death of the basic cardholder. *See Cherry v. Amoco Oil Co.,* 490 F.Supp. 1026 (N.D. Ga. 1980); *Vander Missen v. Kellogg-Citizens National Bank,* 481 F.Supp. 742 (E.D. Wis. 1979). She could also have challenged American Express's entire credit system as violative of the Act.